UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CIVIL ACTION NO. 5:09-CV-317-KKC
(Consolidated with 5:10-CV-00072-KKC)

CRESTWOOD FARM BLOODSTOCK, LLC                                    PLAINTIFF

v.

**<u>MEMORANDUM OPINION AND ORDER</u>**

EVEREST STABLES, INC., and JEFFREY L. NIELSEN                     DEFENDANTS

This matter is before the Court on Crestwood's Motion for Summary Judgment [DE 152] and Everest's Motion for Partial Summary Judgment. [DE 154]. Crestwood moves for summary judgment on its breach of contract claim relating to the Island Fashion filly and on all of Everest's claims against it.  Everest moves for partial summary judgment on its claims for breach of contract and breach of fiduciary and agency duties regarding the Island Fashion filly. The matter has been fully briefed and argued. For the following reasons, the Court GRANTS Crestwood's motion and DENIES Everest's motion.

## I.  BACKGROUND

Pope McLean Sr. owns and operates Crestwood Farm Bloodstock LLC ("Crestwood"), a Kentucky limited liability company that operates a thoroughbred horse farm in Central Kentucky. Jeffrey Nielsen owns and operates Everest Stables ("Everest"), a Minnesota corporation that breeds and races thoroughbreds.

1

Everest began boarding broodmares at Crestwood in 1993. Later, in 1997, Everest sent the stallion Petionville to Crestwood to stand stud. Everest and Crestwood did not sign a formal stallion management contract, but, on October 2, 1996, Jeffrey Nielsen wrote a letter to Pope McLean that established a "protocol" for breeding Petionville. The protocol required Crestwood to supply Nielsen with information regarding each prospective broodmare and to obtain Nielsen's approval before entering a contract to breed the stallion. [DE 152-6].

In this case, Everest contends that Crestwood was Everest's agent and fiduciary regarding Petionville by virtue of a management contract formed through "thousands and thousands of faxes, correspondence, and telephone calls, consistent with their arrangement for the management of Petionville." [DE 160 at 3]. Crestwood maintains that Everest retained full ownership, management and control over Petionville and that Crestwood's responsibility was limited to boarding the horse and breeding him at Everest's direction. [DE 152-1 at 3].

Everest claims that in 2005, an oral contract was formed when Everest rejected an offer to purchase Petionville for $6.5 million based upon Pope McLean's advice and promise to take the stallion to the next level. [DE 160 at 16-17]. Everest claims that Crestwood breached this oral agreement and destroyed the value of Petionville to prevent Everest from either selling the stallion or moving him to another farm. Everest further alleges that Crestwood breached its fiduciary obligations by not passing along volume discounts on veterinary services and by engaging in other secret deals. Crestwood denies that it owed any fiduciary duty to pass along veterinary discounts to Everest. Further, Crestwood denies the existence of any kind of oral contract regarding Petionville and asserts that Petionville's value decreased simply because his stud fee was not justified by the performance of his offspring.

2

At some point before November 2008, Nielsen decided to liquidate his equine holdings by selling all of his horses boarded at Crestwood. Toward that end, in November 2008, the parties entered into a Purchase and Sale Agreement ("the November 4 Agreement" or "Agreement"). [DE 152-4]. Crestwood agreed to board and manage the sale and disposition of more than 100 Subject Horses identified in the November 4 Agreement. The Agreement stated that Crestwood "shall consign for sale and shall offer for sale and shall sell" the Subject Horses. [November 4 Agreement para. 3 & 4]. To facilitate the sale of the Subject Horses, Everest transferred title, ownership and the risk of loss to Crestwood for all but two of the Subject Horses—Island Fashion and the 2008 Storm Cat/Island Fashion filly ("Island Fashion filly"). Crestwood assumed the costs associated with boarding and prepping all of the horses for sale, including Island Fashion and the Island Fashion filly, the two horses still owned by Everest. [November 4 Agreement para. 1 & 2].

The Agreement stated that "[f]or all horses to be sold at public auction, Crestwood agrees and covenants that each horse shall be sold with no reserve, RNA, or buyback price."[1] [November 4 Agreement para. 7]. Although the Agreement expressly prevented Crestwood from placing reserves on the Subject Horses, the Agreement is silent regarding Everest's ability to place reserves on the horses it owned. As compensation for selling the Subject Horses, the November 4 Agreement provided that Crestwood would receive a percentage[2] of the "net sale proceeds" from each horse. The Agreement defined "net sale proceeds" as the "'fall of the

---

[1] RNA or Reserve Not Attained occurs when the owner of a horse or its agent wins the auction. The owner's winning bid is deemed the reserve, and the owner retains ownership of the horse. The parties use the term RNA as both a noun and verb, "to place an RNA on a horse" or "to RNA a horse," and the Court will do so as well.

[2] 25% or 50%, depending on the projected value of each horse. Crestwood received 25% of the net sale proceeds from the most valuable horses and 50% of the net sale proceeds from the less valuable.

3

hammer' sales price for each such horse, after deduction of the . . . auction company's standard sales commission, without any credits or offsets whatsoever." [November 4 Agreement para. 8.A].

After entering into the Agreement, Everest asked Crestwood to set reserves on many of the Subject Horses to protect their value at auction. Crestwood responded that under the terms of the November 4 Agreement, it was prohibited from setting reserves on the Subject Horses.

Consistent with the November 4 Agreement, Crestwood entered the Island Fashion filly in the 2009 September Keeneland Sale. Without Crestwood's knowledge or agreement, Everest sent an agent to the sale. When the bidding reached $875,000, Everest's agent bid $900,000. There were no other bids, and the hammer fell at $900,000. The agent then signed the ticket "RNA" (Reserve Not Attained), which under Keeneland rules nullified the sale.

Crestwood contends that by "RNAing" and nullifying the sale of the Island Fashion filly, Everest breached the November 4 Agreement and deprived Crestwood of the 25% commission it would have earned on the net sale proceeds from the sale of the filly. To offset its lost commission, Crestwood retained $219,513.89 of proceeds owed to Everest from the sale of other Subject Horses.

In seeking to recover the disputed $219,513.89 plus other damages from Crestwood, Everest asserts six causes of action: (I) Intentional Breach of the Implied Covenant of Good Faith and Fair Dealing; (II) Breach of Expressed and Implied Contract; (III) Intentional Breach of Fiduciary and Agency Duties; (IV) Civil Conspiracy; (V) Fraud; and (VI) Unjust Enrichment. [DE 105]. Crestwood asks this Court to declare that it did not violate various expressed and implied contracts with Everest. It also asserts that Everest breached the implied covenant of

honesty, good faith and fair dealing, and breached its contract regarding sale of the Island Fashion filly so it should retain the disputed $219,513.89. [DE 113].

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to show that a particular fact is disputed, a party must cite to "particular parts of materials in the record." Fed. R. Civ. P. 56(c). A party opposing a motion for summary judgment cannot "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A scintilla of evidence in support of the plaintiff's position is not enough because there must be enough evidence to allow a jury to reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering a motion for summary judgment, the court must view the facts contained in the record and draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587. What the court must ultimately determine is whether there is a sufficient dispute about the evidence to require submission to the jury, or whether the evidence favors one side so strongly that it is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 251–52.

## III. DISCUSSION

Everest seeks partial summary judgment on the disputed funds relating to the sale of the Island Fashion filly. [DE 154]. Crestwood seeks summary judgment on all of Everest's claims,

and on its claim for breach of contract relating to the sale of the Island Fashion filly. [DE 152]. For the following reasons, Crestwood's motion is GRANTED and Everest's motion is DENIED.

### A.  Intentional Breach of the Implied Covenant of Good Faith and Fair Dealing

Everest's claim for Intentional Breach of the Implied Covenant of Good Faith and Fair Dealing fails as a matter of law. Kentucky law does not recognize an independent tort for breach of good faith and fair dealing outside of insurance contracts. *Ennes v. H&R Block E. Tax Servs., Inc.*, No. 3:01CV-447-H, 2002 WL 226345, at *4 (W.D. Ky. Jan. 11, 2002); *see also Francis v. Nami Res. Co.*, No. 04-510, 2008 WL 852047, at *12 (E.D. Ky. Mar. 28, 2008). Kentucky law "does impose an obligation of good faith in the performance of any contract [but] it does not create an independent cause of action." *Peacock v. Damon Corp.*, 458 F. Supp. 2d 411, 419–20 (W.D. Ky. 2006).

### B.  Breach of Expressed and Implied Contracts

Other than the discussion of the Island Fashion filly in its motion for partial summary judgment, Everest does precisely identify all of the contracts on which it seeks to recover in this case. However, based on Everest's factual discussions in its pleadings and papers, the Court will address the claims set forth below.

1.  <u>Expressed Contracts</u>

In Everest's Response to Crestwood's Motion for Summary Judgment, Everest asserts not only that Crestwood breached the November 4 Agreement, but that Crestwood breached an expressed contract to manage Petionville. [DE 160 p. 26-27].

6

a.  <u>Management of  Petionville</u>

Everest claims that Crestwood expressly agreed to manage the stallion Petionville and that the terms of the management agreement are evidenced by countless faxes, correspondence and phone calls between the parties throughout their relationship.

A contract must "contain definite and certain terms setting forth promises of performance to be rendered by each party." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997) (citing *Fisher v. Long*, 172 S.W.2d 545 (Ky. 1943)). A plaintiff must show that an actual agreement existed with clear and convincing evidence. *Quadrille Bus. Sys. v. Kentucky Cattlemen's Ass'n,* 242 S.W.3d 359, 364 (Ky. App. 2007). Everest has failed to point to any evidence in the record indicating the "definite and certain terms" of a contract. Thus, there is no expressed contract for the management of Petionville, and all claims relating to alleged breaches of such contract will be dismissed.

b.  <u>November 4 Agreement—Island Fashion Filly</u>

Both Everest and Crestwood seek summary judgment on their claims that the other party breached the November 4 Agreement regarding the sale of the Island Fashion filly. Everest claims that Crestwood breached the Agreement by refusing to protect the value of the Island Fashion filly and set a reserve on the filly at the 2009 Keeneland Sale. Crestwood maintains that the November 4 Agreement prohibited its placement of a reserve on any of the Subject Horses. Moreover, Crestwood insists that it fulfilled its obligation under the Agreement by boarding, prepping and placing the Island Fashion filly in the September Keeneland Sale and that Everest breached the contract by nullifying the sale of the filly and depriving Crestwood of the commission it would have earned.

In resolving this dispute, the Court must determine whether Everest had a legal right to nullify the sale of the Island Fashion filly. The answer to that question is undisputedly "yes." As the owner of the horse, Everest had the right to block its sale at auction. The Court must next consider whether in blocking the sale, Everest breached its obligations under the November 4 Agreement with Crestwood? For reasons stated below, the answer is also "yes."

The November 4 Sale Agreement provided that "Everest shall retain title and ownership to . . . the [Island Fashion filly]." [DE 152-4, Agreement para. 1]. Although Everest retained title to the filly, the Agreement stated that Crestwood "shall cosign for sale and shall offer for sale and *shall sell*" the Subject Horses, including the Island Fashion filly. [Agreement para. 4 (emphasis added)].  Moreover, the Agreement expressly prohibited Crestwood from entering a reserve on any of the Subject Horses.

Everest argues that this agreement to sell was not absolute but only "as mutually agreed and determined between Everest and Crestwood." [Agreement para. 4]. This argument is without merit because the cited limitation only identified the "recognized 2009 Kentucky public auction sale(s)" at which the filly would be sold, not whether the filly would be sold. In fact, the parties agreed that the removal of the filly from the agreed upon "recognized 2009 Kentucky public auction sale(s) . . . shall only be by mutual written agreement of Everest and Crestwood." [Agreement para. 4].

Although the November 4 Agreement carved out an exception regarding the ownership of the Island Fashion filly, it did not carve out an exception regarding Crestwood's obligation to sell the filly. While Everest's ownership status reserved its ability to RNA the filly, it did not relieve Everest of its obligation to pay Crestwood for carrying out its obligations under the Agreement.

8

Stated another way, Crestwood did what was required of it by the clear and unambiguous terms of the contract and Everest's actions interfered with Crestwood's ability to receive the fruits of the contract. Everest exercised a legal right. In so doing, however, it alone prevented the occurrence a condition of the contract under which payment would be due.

This interpretation is supported by the doctrine of necessary implication. Every contract carries "a duty to do everything necessary to carry them out." *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991). Thus, the law will imply that contracting parties will "refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Slater v. Pearle Vision Center, Inc.* 546 A.2d 676, 679 (Pa. Super. Ct. 1988); *accord In re Regal Cinemas, Inc.*, 213 F. App'x 369, 375 (6th Cir. 2006). Here, Everest and Crestwood agreed that Crestwood would sell the Island Fashion filly. It must necessarily follow that Everest had a duty to refrain from taking actions that would destroy or injure Crestwood's right to receive the benefit of its bargain—25% of the "fall of the hammer" sales price.

This interpretation is further supported by the longstanding contract principle that the implied covenant of good faith and fair dealing prohibits a party from preventing the occurrence of a condition that would otherwise cause payment to become due under the contract. *See Odem Realty Co. v. Dyer*, 45 S.W.2d 838, 840 (Ky. 1932). Almost two hundred years of Kentucky case law provides that if the failure of a condition "is caused by the party against whom the condition operates to impose a duty," the nonoccurrence or nonperformance of that condition is excused. *Estate of Riddle ex. rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 406–07 (6th Cir. 2005). Here, the condition that would entitle Crestwood to payment was the sale of the Island

Fashion filly at the Keeneland auction. Crestwood did everything required of it by the contract. By blocking the sale of the filly, Everest alone caused the failure of the condition that entitled Crestwood to the fruits of its labor and the benefit of its bargain.

Everest's conduct, although not explicitly prohibited by the contract, prevented Crestwood from fulfilling the clear and unambiguous purpose of the contract—sell the Subject Horses including the Island Fashion filly. The fact that Everest retained other rights outside the contract does not alter the terms of this otherwise unambiguous agreement to sell the Island Fashion filly. Therefore, Crestwood's motion for summary judgment with respect to the Island Fashion filly is GRANTED, and Everest's motion for partial summary judgment is DENIED.

   c.   Other Breaches of the November 4 Agreement

Everest alleges in portions of its factual discussion, without providing legal analysis, that Crestwood breached the November 4 Agreement by selling some horses to affiliated parties and by failing to use commercially reasonable or best efforts in selling the horses. Everest's "Legal Analysis and Discussion" section simply states "from the above, the Court is aware of the purpose and background for the parties' November 4 Agreement. As described above, these various express[ed] agreements were breached by Crestwood." [DE 160 at 27]. Other than allegations regarding the Island Fashion filly, Everest's Legal Analysis and Discussion does not cite to any evidence that supports its claim that Crestwood breached the November 4 Agreement. [*See* DE 160 at 23–40]. Nevertheless, the Court pieced together Everest's various factual allegations and considered whether the claims survive summary judgment.

1.   Insider Purchases

First, Everest alleges that Crestwood "did nothing to advise or prevent affiliated parties from purchasing Everest's horses." [DE 160 at 22]. Everest maintains that these purchases violated the Agreement which stated that "Crestwood shall sell . . . only to unaffiliated third parties." [Agreement para. 7]. Assuming that the alleged conduct constitutes a breach, Everest does not claim and has not shown any damages. The sales took place in the light and transparency of a public auction. There is no evidence that Everest suffered any damages from "affiliated parties" purchasing Everest's horses.

2.   Commercially Reasonable Efforts and Failure to Set Reserves

Throughout its briefs, Everest generally alleges that Crestwood did not use "all commercially reasonable efforts" to prepare, market, and sell the horses. For example, in one factual discussion Everest argues that Crestwood failed to work with Everest to set reserve prices, RNA horses, buyback or remove certain horses to protect their value. [DE 154-1 at 4]. In the Agreement, however, "Crestwood agree[d] and covenant[ed] that each horse shall be sold with no reserve, RNA or buyback price." [Agreement para. 7]. Everest attempts to have it both ways by arguing that Crestwood breached the Agreement by failing to set reserves, despite the Agreement's clear and unambiguous language prohibiting Crestwood from setting reserves.

Everest alleges that Crestwood advised the public that Everest's horses were being sold without reserves and that these statements inflicted serious and substantial damage on their sales prices. [DE 160 at 21–22]. Crestwood sold the horses without reserves because it was contractually obligated to do so. Moreover, the Agreement is silent regarding the manner and

method of marketing or advertising the sale to the public. Therefore, this Court declines to entertain the argument that Crestwood breached the Agreement by truthfully stating the conditions of the sale as specified in the Agreement.

Next, Everest claims that Crestwood breached the Agreement by selling 23 horses to Don Ackel for $20,000. Everest relies on an expert report from Cecil Seaman who opines that the horses were worth more than $100,000 and that Crestwood undertook no marketing efforts to maximize the sales price. Everest also claims that Crestwood contacted only one buyer which "does not meet any reasonable standard for maximizing the sales price." [DE 160 at 20]. However, simply asserting that actions do not meet any reasonable standard for maximizing the sales price is not evidence that those actions actually failed to meet a reasonable standard for maximizing the sales price. Everest provides no evidence as to what types of marketing and sales efforts are normal for this type of liquidation. Everest's expert testimony that these horses were worth $100,000 is not evidence that Crestwood failed to use commercially reasonable means to sell the horses. The Agreement itself contemplates that the horses might be "disposed of," rather than sold. Such language suggests the parties' recognition that a willing buyer might not be found and Everest offers no evidence as to how Crestwood might have improved the value of the horses.

In sum, Everest points to no evidence that Crestwood did anything wrong or improper in a time of global economic crisis. Nothing in the record indicates that the thoroughbred industry was exempt from this crisis. Everest expresses a general displeasure with some of the results of the sales, but offers no evidence on what Crestwood did wrong and how their actions departed from industry norms or commercially reasonable practices. Further, Everest's claim that

Crestwood did not maximize the sales value of the horses is at odds with Everest's repeated assertions that Crestwood received a windfall from the sales. Accordingly, Crestwood's motion for summary judgment on all of Everest's breach of expressed contract claims is GRANTED.

2. Implied Contracts

Everest has put forth two arguments that Crestwood breached implied contracts relating to Petionville. First, Everest argues that Crestwood breached an implied contract to act as the stallion manager for Petionville. Second, Everest claims that Crestwood breached an implied contract to take Petionville to the next level. [DE 160 at 17].

Everest argues that "Crestwood agreed to and performed a variety of tasks with respect to Petionville" including:

1. Handling him in the breeding shed
2. Handling contracts for mares
3. Booking mares to Petionville
4. Advising on which mares to breed to Petionville
5. Advising on which horses to sell or race
6. Advising on which sales to place Petionville's offspring in, and
7. Performing marketing services to sell Petionville seasons. [DE 160 at 27].

Then, Everest simply states "[a]s described above, Crestwood breached its duties by failing to effectively market and sell Petionville seasons." Given this statement, the Court finds that Crestwood did not breach obligations one (1) through six (6) listed above. The Court has combed the record and found no allegations that Crestwood breached any implied management agreement other than "failing to effectively market and sell Petionville seasons."

In support of its claim, Everest offers nothing more than Nielsen's statement that Crestwood took no efforts to market Petionville seasons after February 2005. [DE 160 at 28-29]. Everest cites no evidence as to what efforts were made prior to February 2005, nor any evidence

from third parties about the lack of marketing. Additionally, Everest cites no evidence that Nielsen complained about this "lack of marketing" that allegedly began four years before this lawsuit. Everest has offered no evidence of what constitutes marketing, much less effective marketing. The record indicates that Everest is a sophisticated equine operation that at least participated, often intimately, in most of the decisions regarding Petionville. There is no doubt that Everest was directly involved with the vast majority of major decisions regarding Petionville because it alleges that Crestwood breached the Protocol Letter by failing to provide Nielsen with mare pedigrees. This bare bones breach of contract allegation is insufficient to survive summary judgment because there are no allegations, let alone evidence, of any damages related to violations of the Protocol Letter. A simple assertion by the plaintiff, with no additional evidence is not sufficient to survive a motion for summary judgment. Nevertheless, the existence of the Protocol Letter and the fact that Crestwood complied with the terms of the Protocol Letter, except in a few instances over a decade, provides further evidence that Crestwood did not agree to manage Petionville.

Next, Everest argues that Crestwood breached an implied contract to take Petionville to the next level and "increase its promotion of Petionville." [DE 160 at 17]. This alleged contract is impermissibly vague because it does not "contain definite and certain terms setting forth promises of performance to be rendered by each party." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997) (citing *Fisher v. Long*, 172 S.W.2d 545 (Ky. 1943)). Everest has neither defined the "next level" nor identified what Crestwood could or should have done to take Petionville there. Everest merely claims that the lack of a defined sales team demonstrates that Crestwood did nothing other than what Nielsen told them to do. Everest has produced no evidence that

14

Crestwood contracted with Everest to have a defined sales team for Petionville, or that a defined sales term was part of this contract to take Petionville to the next level.

For reasons stated above, Crestwood's motion for summary judgment with respect to all of Everest's claims for breach of implied contracts is GRANTED.

### C.  Intentional Breach of Fiduciary and Agency Duties

Everest seeks partial summary judgment on its claim that Crestwood breached fiduciary and agency duties regarding the Island Fashion filly. Crestwood seeks summary judgment dismissing Everest's claim in its entirety. Throughout its papers, Everest uses the terms "fiduciary and agency duties" interchangeably, without distinguishing between these distinct legal concepts. Everest attempts to apply Crestwood's limited agency responsibilities in a broader context so as to create a general fiduciary duty on Crestwood's part.  Together or separately, however, Everest's arguments fail for reasons set forth below.

#### 1.  Fiduciary Duty

To establish a fiduciary duty, a party must demonstrate that (1) "the relationship existed before the transaction that is the subject of the action," (2) the reliance was not merely subjective and was reasonable, and (3) "the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary." *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002). Everest argues that Crestwood breached its fiduciary duty through its failure to manage Petionville properly and in its conduct with respect to the November 4 Agreement.

According to Everest, this fiduciary relationship began when Everest first boarded its mares at Crestwood. Everest claims that this relationship arose because Pope McLean said he would "put [Nielsen's] interest first, and [Nielsen] could put [his] full faith and confidence in him" [DE 160 at 31]. Thus, Everest has produced evidence showing some kind of relationship existed before the transactions that are the subject of Everest's claims. Everest, however, has not produced evidence demonstrating that Nielsen's reliance on Crestwood was reasonable and not subjective. "Only in rare commercial cases is it reasonable to believe the other party will put your interests ahead of their own." *In re Sallee*, 286 F.3d at 892. In business, "[i]t is one thing to trust someone to deal honestly and quite another to trust someone to put one's interest above his own. *Extraordinary facts* are necessary to make this latter kind of trust plausible and reasonable." *Id.* at 892 n. 10 (emphasis added) (quoting Anderson, *The Wolf at the Campfire: Understanding Confidential Relationships*, 53 S.M.U. L. Rev. 315, 320 (2000)).

The evidence shows that Nielsen is a wary, sophisticated and experienced businessman, capable of making character and business decisions. Additionally, the evidence suggests that Nielsen was intimately involved in decisions regarding Petionville's management. Everest has failed to cite facts, let alone "extraordinary facts," that demonstrate Nielsen reasonably believed that Crestwood was Everest's fiduciary. The only evidence cited is Pope McLean Sr.'s deposition testimony saying that he believed Crestwood was conducting itself with honesty and full disclosure. [DE 160 at 32]. Everest has not produced evidence that makes it reasonable to believe that Crestwood, a for-profit business, would place Everest's interest, another for-profit business, ahead of its own.

Everest cites no evidence that the business relationship between Crestwood and Everest imposed a duty on Crestwood to act in Everest's interest, even to the detriment of Crestwood. In order to create a fiduciary relationship, the primary reason for the arrangement must be to benefit one party over the other. *See Abney v. Amgen, Inc.*, 443 F.3d 540, 550 (6th Cir. 2006). There is no evidence that the parties' business relationship was primarily for the benefit of Everest over Crestwood. The November 4 Agreement was made for the parties' mutual benefit, "both Crestwood and Everest." [Agreement para. 7]. Crestwood and Everest are both for-profit businesses that entered into a series of arms-length transactions over an extended period of time. Crestwood had a duty to provide services, not a duty to sacrifice its own interests for Everest's. Nothing in the record comes close to showing the "extraordinary facts" necessary to convert Everest and Crestwood's business relationship into a fiduciary one.

Finally, Everest argues that "Keeneland Rules Apply Fiduciary and Agency Duties." [DE 160 at 32]. Keeneland's auction rules do indeed create a principal-agent relationship, with fiduciary aspects, but these rules apply only to the sale of horses at Keeneland. Everest alleges that Crestwood breached its fiduciary duty to Everest through its actions relating to Petionville, not because of conduct related to Keeneland auctions. Further, in relation to the Keeneland auctions in 2009, Crestwood's duties were defined by the November 4 Agreement. Crestwood complied with the Agreement. Whatever legal relationship existed between Crestwood and Everest in the context of Keeneland auctions is irrelevant to the other issues.

## 2. Agency Duty

Crestwood was Everest's agent in two distinct instances, the Keeneland auctions and the execution of the November 4 Agreement. There is a legal distinction between a general fiduciary

17

duty and a limited agency duty created by contract. If a principal-agent relationship is formed by a contract, "the agent's duties are determined by the agreement between the parties." *21C LLC v. Wyndham Management Corp.*, No. 3:05CV-751-S, 2006 WL 1875512, at *3 (W.D. Ky. June 29, 2006) (quoting Restatement (Second) of Agency (1958) § 376). Therefore, Crestwood's agency duties are defined by the Keeneland Rules and the November 4 Agreement.

Everest does not allege that Crestwood breached the duties imposed by the Keeneland Rules. Additionally, as previously discussed *supra,* Crestwood did not breach the November 4 Agreement, so it did not breach any agency duty imposed by the Agreement. In addition to the claim that Crestwood breached the Agreement by failing to place reserves on horses and withholding funds to offset the disputed Island Fashion filly sale, Everest argues that Crestwood breached its agency duty by failing to provide records of the expenses and costs associated with the horses under the Agreement. [DE 154-1 at 18].

Crestwood performed its duties imposed by the November 4 Agreement and Everest has not produced any evidence that shows Crestwood did not act "with upmost good faith" to "maximize the sales prices for the Subject Horses." The only specific allegation about what Crestwood did to not maximize the sales prices for the Subject Horses is Crestwood's refusal to put reserves on the horses. Crestwood did not place reserves on the Subject Horses because it was contractually prohibited by the November 4 Agreement from placing reserves on the Subject Horses. Next, the Agreement does not require Crestwood to provide records of expenses and costs, so Crestwood cannot breach its agency duty by failing to provide such records. Everest has failed to argue, let alone offer evidence why failing to produce such records is a violation of good faith or somehow does not maximize the sales prices for the Subject Horses. Crestwood

18

was solely responsible for all costs associated with the Subject Horses and Everest was not reimbursing Crestwood for any costs.

Finally, Everest argues that a "constructive trust" should be formed because Crestwood obtain legal title to Everest's property "through fraud, misrepresentation, concealment, undue influence, or by taking advantage of [Everest's] weakness or necessity." [DE 160 at 34]. The Court has found that Crestwood acted properly and did not obtain title to any of Everest's property through improper means. Accordingly, Everest's motion for summary judgment with respect to violations of agency and fiduciary duties is DENIED and Crestwood's motion is GRANTED.

### D.  Civil Conspiracy

Everest claims that Crestwood and Pope McLean, Sr., an employee of Crestwood, "conspired against Everest in order to induce it to continue its breeding operations." [DE 160 p. 36]. This claim for civil conspiracy is based on the intra-corporate conspiracy doctrine, which allows employees of a corporation and that corporation to form a conspiracy if the employees act outside the course of their employment. *See Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 841 (6th Cir. 1994). Everest has not presented evidence that McLean, Sr. acted outside of his employment for Crestwood Farm Bloodstock, LLC when dealing with Everest. McLean and Crestwood were acting with unity of interest throughout their course of dealings with Everest. Therefore, Crestwood's motion for summary judgment with respect to the civil conspiracy claim is GRANTED.

19

### E.  Fraud

Everest's claim for fraud is based on the allegation that Crestwood promised Everest to take Petionville to the next level.  Everest argues that Crestwood "had no intentions of performing on [its] promise [that] Crestwood would increase their efforts to sell third-party seasons for Petionville." [DE 160 at 37]. A claim for fraud may be based upon the nonperformance of a promise, where the promise is made for the purposes of accomplishing deceit. *Evola Realty Co. v. Westerfield*, 251 S.W.2d 298, 300-01 (Ky. 1952).

Assuming this promise was made, Everest offers no evidence that Crestwood had no intentions of performing on its promise, nor any evidence that Crestwood did not perform on its promise. Everest simply states that Petionville's seasons dropped 85% from 2005 to 2006, but offers no evidence as to why they dropped. Crestwood offers expert testimony that this drop in sales was caused by factors unrelated to Crestwood. Everest offers no evidence on what Crestwood did, or did not do, that caused the drop in sales. Simply asserting that sales dropped is not enough to show that Crestwood caused the drop in sales. Accordingly, Crestwood's motion for summary judgment with respect to the fraud claim is GRANTED.

### F.  Unjust Enrichment

Everest's claim for unjust enrichment is for an "accounting to determine the amount of money owed resulting from a breach of fiduciary duties." [DE 160 at 38]. Because no fiduciary existed, Everest has no claim for unjust enrichment and Crestwood's motion for summary judgment is GRANTED.

**IV. CONCLUSION**

For the foregoing reasons, the Court ORDERS as follows;

1. Crestwood's Motion for Summary Judgment [DE 152] is GRANTED;

2. Everest's Motion for Partial Summary Judgment [DE 154] is DENIED;

3. Everest's Third Amended Complaint [DE 105] is DISMISSED;

4. Crestwood's Claim in Count VI of its Second Amended Complaint for breach of contract is granted as a matter of law and Crestwood is entitled to keep the disputed $219,513.89 plus interest;

5. The Court will schedule a telephonic status conference at a mutually convenient time. The parties should be prepared to discuss whether they wish to proceed with any remaining claims.

Dated this 30th day of March, 2012.

**Signed By:**

***Karen K. Caldwell***

**United States District Judge**